SETH H. ROW, OSB No. 021845
seth.row@stoel.com
CAMERON ZANGENEHZADEH, OSB No. 212756
cameron.zangenehzadeh@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

*Attorneys for Plaintiff PacifiCorp*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| PACIFICORP, formerly PACIFIC POWER & LIGHT COMPANY, an Oregon corporation,<br><br>Plaintiff,<br><br>v.<br><br>ALLIANZ UNDERWRITERS, INC.; AMERICAN EXCESS INSURANCE COMPANY; AMERICAN RE-INSURANCE COMPANY; ASSOCIATED INTERNATIONAL INSURANCE COMPANY; BERKSHIRE HATHAWAY SPECIALTY INSURANCE COMPANY, as successor to STONEWALL INSURANCE COMPANY; CENTURY INDEMNITY COMPANY, as successor to CCI INSURANCE COMPANY, as successor to INSURANCE COMPANY OF NORTH AMERICA, as successor to INDEMNITY INSURANCE COMPANY OF NORTH AMERICA; CHICAGO INSURANCE COMPANY; CONTINENTAL CASUALTY COMPANY; FIREMAN'S FUND INSURANCE COMPANY; INTERSTATE FIRE AND CASUALTY COMPANY; OLD REPUBLIC INSURANCE COMPANY; ST. | Case No.:<br><br>**APPLICATION FOR APPOINTMENT OF ARBITRATOR UNDER 9 U.S.C. § 5**<br><br>ORAL ARGUMENT REQUESTED |

Page 1  -    APPLICATION FOR APPOINTMENT OF ARBITRATOR UNDER 9 U.S.C. § 5

152515351.6 0028702-00030

PAUL SURPLUS LINES INSURANCE
COMPANY; WESTPORT INSURANCE
CORPORATION, as successor TO THE
MANHATTAN FIRE AND MARINE
INSURANCE COMPANY, as successor to
PURITAN INSURANCE COMPANY,

Defendants.

## I.  INTRODUCTION

In this Application, Plaintiff PacifiCorp seeks the Court's assistance with effectuating the relief ordered by Judge Amy Baggio in the matter *PacifiCorp v. St. Paul Surplus Lines Insurance Co. et al.*, Case No. 3:25-cv-00163-AB. In that prior litigation (which is currently stayed) Judge Baggio compelled arbitration of the underlying insurance coverage dispute between PacifiCorp and three of its insurers. *See* ECF No. 39.

"When parties to arbitration reach a stalemate and 'the contractual selection method is doomed,' the 'district judge has the power to appoint an'" arbitrator under Section 5 of the Federal Arbitration Act ("FAA"). *Hollingsworth v. Sanofi-Aventis US*, No. 3:25-CV-01342-AB, 2025 WL 3280876, at *4 (D. Or. Nov. 24, 2025) (brackets omitted) (quoting *Pac. Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*, 814 F.2d 1324, 1329 (9th Cir. 1987)). Section 5 reflects a straightforward command: when parties agree on a method for selecting arbitrators, that method must be followed—and when it cannot be implemented, the Court must step in to ensure that arbitration proceeds. This case, unfortunately, falls into the latter category.

Page 2  -  APPLICATION FOR APPOINTMENT OF ARBITRATOR UNDER 9 U.S.C. § 5

Ten days after Judge Baggio's denial of Plaintiff's Motion for Reconsideration or Clarification of the Court's Opinion & Order Compelling Arbitration and Staying Proceedings on October 7, 2025, PacifiCorp, formerly Pacific Power & Light Company ("PacifiCorp"), demanded arbitration of all insurers named in this Application. What followed were sustained efforts by PacifiCorp to implement the arbitration provisions. But those efforts have not achieved the result contemplated by Judge Baggio's order. This appears to be because PacifiCorp and certain of the insurer Defendants hold fundamentally different—and irreconcilable—interpretations of the arbitration provisions. Those differences include whether multiple aligned insurers may each appoint an arbitrator or instead should act collectively as a single "party." Moreover, some insurers have essentially failed to participate in any workable selection process; others have advanced conflicting and mutually incompatible approaches to arbitrator appointment; still others have taken positions that make the agreed method impossible to implement in practice.

The result is an impasse. More than five months have passed since PacifiCorp demanded arbitration, and the parties remain unable to constitute a tribunal under the agreed method. That kind of stalemate—regardless of fault—falls squarely within Section 5, which applies where parties "fail to avail" themselves of the agreed method or where "for any other reason there shall be a lapse in the naming of an arbitrator." The present circumstances satisfy both.

Congress anticipated this situation. In enacting Section 5 of the FAA, it intended to "facilitat[e] arbitration when impasse in selection" of an arbitrator arises and "to spur the arbitral process forward, rather than to let it stagnate into endless bickering over the selection process." *Pac. Reinsurance*, 814 F.2d at 1329. Section 5 thus directs the Court to do what the insurers, despite their efforts, have been unable to do: designate and appoint an arbitrator so that the arbitration may proceed with the force and effect the parties agreed to.

Page 3  -    APPLICATION FOR APPOINTMENT OF ARBITRATOR UNDER 9 U.S.C. § 5

Accordingly, PacifiCorp respectfully requests that the Court (1) find that Defendants have failed to avail themselves of the agreed method for appointing an arbitrator, or that a lapse has occurred in Defendants' naming of an arbitrator, and (2) adopt PacifiCorp's reasonable interpretation of the arbitration appointment method, and appoint an arbitrator for all of the Defendants named in this Application.

## II. PARTIES

The Defendants in this Application are Allianz Underwriters, Inc. ("Allianz"); American Excess Insurance Company ("American Excess"); American Re-Insurance Company ("American Re"); Associated International Insurance Company ("Associated International"); Berkshire Hathaway Specialty Insurance Company, as successor to Stonewall Insurance Company ("Berkshire"); Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America, as successor to Indemnity Insurance Company of North America ("Century"); Chicago Insurance Company ("Chicago"); Continental Casualty Company ("Continental"); Fireman's Fund Insurance Company ("Fireman's Fund"); Interstate Fire and Casualty Company ("Interstate Fire"); Old Republic Insurance Company ("Old Republic"); St. Paul Surplus Lines Insurance Company ("St. Paul"); and Westport Insurance Corporation, as successor to The Manhattan Fire and Marine Insurance Company, as successor to Puritan Insurance Company ("Westport") (collectively, the "Defendants").

- PacifiCorp is an Oregon corporation, with its principal place of business in Portland, Oregon. PacifiCorp was formerly known as the Pacific Power & Light Company.

- Upon information and belief, Allianz is a California corporation, with its principal place of business in Chicago, Illinois.

- Upon information and belief, American Excess is a Delaware corporation, with its

Page 4  -  APPLICATION FOR APPOINTMENT OF ARBITRATOR UNDER 9 U.S.C. § 5

principal place of business in Princeton, New Jersey.

- Upon information and belief, American Re is a Delaware corporation, with its principal place of business in Princeton, New Jersey.

- Upon information and belief, Associated International is a California corporation, with its principal place of business in Deerfield, Illinois.

- Upon information and belief, Berkshire is a Nebraska corporation, with its principal place of business in Lincoln, Nebraska.

- Upon information and belief, Century is a Pennsylvania corporation, with its principal place of business in Philadelphia, Pennsylvania.

- Upon information and belief, Chicago is an Illinois corporation, with its principal place of business in Chicago, Illinois.

- Upon information and belief, Continental is an Illinois corporation, with its principal place of business in Chicago, Illinois.

- Upon information and belief, Fireman's Fund is a California corporation, with its principal place of business in Chicago, Illinois.

- Upon information and belief, Interstate Fire is a California corporation, with its principal place of business in Chicago, Illinois.

- Upon information and belief, Old Republic is a Pennsylvania corporation, with its principal place of business in Mt. Pleasant, Pennsylvania.

- Upon information and belief, St. Paul is a Delaware corporation, with its principal place of business in Hartford, Connecticut.

- Upon information and belief, Westport is a Missouri corporation, with its principal place of business in Kansas City, Missouri.

Page 5  -    APPLICATION FOR APPOINTMENT OF ARBITRATOR UNDER 9 U.S.C. § 5

152515351.6 0028702-00030

### III.  JURISDICTION AND VENUE

This Court has subject matter jurisdiction and the authority to grant the requested relief under 9 U.S.C. § 5. There is complete diversity between the parties and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in Portland, Oregon.

### IV.  INSURANCE POLICIES

The underlying insurance coverage dispute here concerns excess general liability insurance policies issued to PacifiCorp by the Defendants. Copies of each of the Defendants' policies and/or secondary evidence are provided in the accompanying declaration. *See generally* Declaration of Cameron Zangenehzadeh ("Zangenehzadeh Decl."), ¶2, Ex. 1.

### V.  ARBITRATION AGREEMENTS

The Allianz, American Excess, American Re, Associated International, Berkshire, Century, Chicago, Continental, Interstate Fire, Old Republic, St. Paul, and Westport policies each contain, or follow form to policies that contain,[1] the following arbitration provision:

> All differences arising out of this Policy may[2] be referred to the decision of an arbitrator to be appointed by the parties in difference or, if they cannot agree upon a single arbitrator, to the decision of two arbitrators, one to be appointed in writing by each of the parties, or in case of disagreement between the arbitrators, to the decision of an umpire to be appointed in writing by the arbitrators before entering on the reference, and in the event of such arbitrations, unless and until an award has been made, Underwriters shall not be liable for any loss, and such award shall be a condition precedent to any liability of Underwriters or any right of action against the Company in respect of such claim. Said arbitration shall take place in the City of Portland, Oregon, and the cost of arbitration shall be borne equally between the parties in difference.

---

[1] Copies of all underlying policies to which certain policies at issue follow form as noted above are attached. *See* Zangenehzadeh Decl., ¶3, Ex. 2.

[2] Century Policies XCP 691 and XCP 813 use the term "shall" instead of "may" but are otherwise substantially the same.

Page 6  -    APPLICATION FOR APPOINTMENT OF ARBITRATOR UNDER 9 U.S.C. § 5

PacifiCorp does not possess a copy of Fireman's Fund Policy No. XLX 1045008 and instead relies on secondary evidence. That policy is a quota-share policy with American Re Policy No. M0090753, which follows form to Lloyd's Policy No. 7009584. The Lloyd's policy contains the above-referenced arbitration provision. For purposes of this Application, PacifiCorp therefore avers that the Fireman's Fund policy likewise follows form to the underlying Lloyd's policy.

## VI.  FACTUAL BACKGROUND

PacifiCorp sued Century, St. Paul, and Westport on January 16, 2025 in the Circuit Court of the State of Oregon for the County of Multnomah, Case No. 25CV03497, for Breach of Contract, Unfair Environmental Claims Settlement Practices (ORS 465.484), and Declaratory Judgment regarding losses PacifiCorp has sustained in connection with the Portland Harbor Superfund Site ("PHSS"). Century, St. Paul, and Westport removed the case to the U.S. District Court for the District of Oregon on January 30, 2025, Case No. 3:25-cv-00163-AB, and the case was assigned to Judge Baggio. Century and Westport filed Motions to Dismiss for Failure to State a Claim or Alternatively to Stay and Compel Arbitration, Dkts. 24 & 25, to which St. Paul joined, Dkt. 26.

The Court granted Century and Westport's motions to compel and stayed the proceedings pending the outcome of arbitration. Dkt. 39. Copies of the Court's orders compelling arbitration are attached. *See* Zangenehzadeh Decl., ¶4, Ex. 3.

 PacifiCorp then initiated efforts to establish a workable framework for arbitration. PacifiCorp proposed that the parties to the stayed federal court litigation[3] agree to a three-arbitrator panel governed by the American Arbitration Association's ("AAA") Commercial Arbitration

---

[3] PacifiCorp's proposal was made to the original insurer-defendants: St. Paul, Westport, and Century.

Page 7  -    APPLICATION FOR APPOINTMENT OF ARBITRATOR UNDER 9 U.S.C. § 5

152515351.6 0028702-00030

Rules. *See* Zangenehzadeh Decl., ¶5, Ex. 4. The following day, PacifiCorp tendered its indemnity claims to all excess insurers and requested that each insurer either accept coverage or participate in arbitration to resolve coverage and allocation issues arising from the PHSS, with a written response requested within 30 days. *See* Zangenehzadeh Decl., ¶6, Ex. 5.

In the weeks that followed, the parties began engaging on arbitration structure and procedures. Westport responded that it was not inclined to agree to a joint arbitration involving all insurers, and instead suggested proceeding under an interpretation of the arbitration clause not shared by PacifiCorp, or other insurers. *See* Zangenehzadeh Decl., ¶7, Ex. 6. As of November 21, 2025, while certain insurers (including St. Paul and Century) had indicated a willingness to consider adoption of AAA Commercial Arbitration Rules, others—including Westport—did not agree that rules should be adopted at the outset, and the parties had not reached agreement on whether arbitration should proceed on a coordinated basis or insurer-by-insurer. During this same period, newly retained counsel for several insurers requested additional time to evaluate PacifiCorp's tender and proposals, and the parties exchanged various communications discussing arbitration structure, governing rules, and potential coordination.

Throughout December 2025 and January 2026, PacifiCorp continued to pursue potential paths toward a coordinated arbitration. On January 6, 2026, PacifiCorp participated in a call with St. Paul, Westport, and Century to discuss arbitration procedures, and made a proposal that arbitration proceed involving the original three insurers only, to resolve certain core issues, with the other insurers agreeing to be bound by the outcome. Certain insurers proposed proceeding before a single arbitrator rather than the three-member panel. PacifiCorp advised that, in its view, the complexity of this matter requires a three-member panel.

Page 8  -   APPLICATION FOR APPOINTMENT OF ARBITRATOR UNDER 9 U.S.C. § 5

152515351.6 0028702-00030

On January 8, 2026, PacifiCorp circulated a written proposal to all excess insurers outlining a streamlined arbitration structure and requesting that each insurer confirm its position by January 21, 2026. *See* Zangenehzadeh Decl., ¶8, Ex. 7. Several insurers responded that they would not agree to be bound by an arbitration in which they did not directly participate, while others requested additional information or indicated a preference for direct participation.

On January 21, 2026, PacifiCorp circulated draft arbitration procedures and proposed a framework that included the use of AAA Commercial Arbitration Rules, JAMS appellate procedures, and a three-arbitrator panel consisting of one arbitrator appointed by PacifiCorp, one appointed by the insurers, and a neutral umpire appointed by the party-appointed arbitrators. *See* Zangenehzadeh Decl., ¶9, Ex. 8. PacifiCorp requested a coordinated response from the insurers by January 30. *See id*. Additional discussions followed, including a call on January 29, but the parties did not reach agreement on arbitration rules, tribunal structure, or the method for appointing arbitrators. PacifiCorp did not receive a unified response from the insurer group as requested.

On February 3, PacifiCorp filed a demand for arbitration with the AAA and designated its party-appointed arbitrator. *See* Zangenehzadeh Decl., ¶10, Ex. 9. On February 4, the AAA asked that all insurers provide consent to AAA administration, because the policies do not designate an administering body or incorporate AAA rules. *See* Zangenehzadeh Decl., ¶11, Ex. 10. By February 11, all the insurers had declined to provide consent, and the AAA closed its file. *See* Zangenehzadeh Decl., ¶12, Ex. 11.

In the days that followed, certain insurers indicated a willingness to proceed with arbitrator appointments under their respective interpretations of the policies. For example, on February 10, St. Paul indicated its willingness to proceed with a three-arbitrator panel, Zangenehzadeh Decl., ¶13, Ex. 12, and on February 16, Westport designated its party-appointed arbitrator,

Page 9  -   APPLICATION FOR APPOINTMENT OF ARBITRATOR UNDER 9 U.S.C. § 5

152515351.6 0028702-00030

Zangenehzadeh Decl., ¶14, Ex. 13, but both insurers presumed entitlement to appointment of their own party-appointed arbitrator.

In summary, despite significant attempts by PacifiCorp to achieve agreement, the parties have not reached agreement on a method for constituting an arbitral tribunal. More than five months have passed since PacifiCorp first demanded arbitration on October 17, 2025, but the parties have not agreed on naming of arbitrators. The parties' differing interpretations of the arbitration provisions—particularly with respect to the method of arbitrator appointment—have prevented implementation of the agreed method for selecting arbitrators and resulted in a lapse within the meaning of FAA Section 5.

## VII.  ARGUMENT

### A.    FAA Section 5 Standard

Section 5 of the FAA instructs that where an arbitration agreement provides "a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed." 9 U.S.C. § 5. But "if a method be provided and any party thereto shall fail to avail himself of such method, or if for any other reason there shall be a lapse in the naming of an arbitrator . . . or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator . . ., as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein." *Id*.; *see also Hollingsworth*, 2025 WL 3280876, at *2 (citing *Pac. Reinsurance*, 814 F.2d at 1327).

A party "fail[s] to avail" themselves "when an arbitration agreement designates an arbitrator, or specifies a procedure for selecting an arbitrator, and one of the parties refuses to comply, thereby delaying arbitration indefinitely." *In re Salomon Inc. S'holders' Derivative Litig*., 68 F.3d 554, 560 (2d Cir. 1995) (quoting 9 U.S.C. § 5 and citing *Pac. Reinsurance*, 814 F.2d at

Page 10 -    APPLICATION FOR APPOINTMENT OF ARBITRATOR UNDER 9 U.S.C. § 5

1327–29). "[T]he 'lapse' referred to in § 5 means 'a lapse in time in the naming of the' arbitrator or in the filling of a vacancy on a panel of arbitrators, or some other mechanical breakdown in the arbitrator selection process[.]" *Id.* (quoting *Pac. Reinsurance*, 814 F.2d at 1327).

**B.      Defendants' Failure to Avail Themselves of the Agreed Appointment Method and the Resulting Lapse Require Judicial Appointment Under FAA Section 5**

Section 5 of the FAA squarely addresses the circumstances presented here. Where an arbitration agreement provides a method for appointing arbitrators, that method must ordinarily be followed. But Congress expressly recognized that agreed methods may break down in practice. Accordingly, Section 5 authorizes judicial appointment where "any party thereto shall fail to avail himself of such method, or if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators." 9 U.S.C. § 5. As noted in the factual section above, Defendants have failed to follow the arbitrator selection clause of the policies, leading to a lapse in the naming of an arbitrator for Defendants.

Under those circumstances, PacifiCorp is entitled to relief under Section 5. The Ninth Circuit's decision in *Pacific Reinsurance*, 814 F.2d 1324, is directly on point. There, as here, the parties agreed to arbitrate and attempted to implement a contractual arbitrator-selection method. *Id*. at 1325–26. They succeeded in appointing party arbitrators but were unable to agree on the selection of a neutral umpire. *Id*. The resulting stalemate lasted five months. *Id*. at 1326. The Ninth Circuit held that this impasse constituted both a failure to avail and a lapse within the meaning of Section 5, authorizing the district court to appoint the umpire and move the arbitration forward. *Id*. at 1327–29.

The parallels are striking. PacifiCorp demanded arbitration more than five months ago. Since then, the parties have engaged in sustained discussions concerning arbitrator appointment and arbitral structure, yet no tribunal has been constituted. Certain Defendants have declined to

Page 11 -     APPLICATION FOR APPOINTMENT OF ARBITRATOR UNDER 9 U.S.C. § 5

participate in any coordinated appointment process; others have advanced mutually incompatible interpretations of the arbitration provision; still others have taken positions that make the agreed method impossible to implement in practice. The result mirrors *Pacific Reinsurance* precisely: a protracted deadlock that has stalled arbitration altogether.

Here, the lapse is at least as pronounced. More than five months have passed since PacifiCorp's formal arbitration demand, and no arbitration has commenced. As in *Pacific Reinsurance*, without court intervention the parties would "still likely be bickering over the selection process," and resolution of the dispute would remain stalled indefinitely. *Id.* at 1327.[4]

## C.     To the Extent the Dispute Hinges on Competing Interpretations of the Policies' Appointment Method, PacifiCorp's Interpretation Controls

PacifiCorp maintains that the arbitration provision unambiguously requires Defendants to appoint a single arbitrator for this dispute. Any contention that the policies permit each insurer to appoint its own arbitrator is inconsistent with the text and structure of the appointment clause. Properly construed, the clause authorizes only one arbitrator appointment by Defendants.

### 1.     Oregon Law Controls the Interpretation of These Insurance Policies

This case involves a dispute over insurance coverage for the costs of investigating and remediating environmental contamination at property located in Portland, Oregon. PacifiCorp has demanded arbitration to recover millions of dollars of such costs under general liability insurance policies issued by Defendants. That places the case squarely within the scope of the Oregon

---

[4] The Court should reject any argument that the Court must first order additional rounds of compliance before acting on PacifiCorp's request for appointment of an arbitrator for Defendants. In *Pacific Reinsurance*, the Ninth Circuit rejected the argument that the district court was required to compel further attempts at compliance before appointing an arbitrator, explaining that the parties had already been given ample time and opportunity to implement the agreed method. *Id.* at 1329. Once the contractual selection method proves unworkable in practice, Section 5 empowers—and indeed obligates—the court to step in. *Id.* at 1328–29.

Page 12 -     APPLICATION FOR APPOINTMENT OF ARBITRATOR UNDER 9 U.S.C. § 5

Environmental Cleanup Assistance Act ("OECAA"), which governs the interpretation of general liability insurance policies in cases involving environmental claims in this state. In that statute, the Oregon Legislature made its intent that Oregon law control such disputes unmistakably clear:[5]

> [I]n any action between an insured and an insurer to determine the existence of coverage for the costs of investigating and remediating environmental contamination, . . . the following rules of construction *shall* apply in the interpretation of general liability insurance policies involving environmental claims: . . . Oregon law *shall* be applied in all cases where the contaminated property . . . is located within the State of Oregon.

ORS 465.480(2)(a) (emphases added). Accordingly, OECAA requires that Oregon law govern the interpretation of disputed insurance policy provisions. That includes arbitration provisions contained within such policies. In the Court's prior Opinion & Order compelling arbitration, it recognized that Oregon law governs the interpretation of these policies. *See* Dkt. 39 at 5 n.2.

### 2.     Oregon Principles of Insurance Policy Interpretation

"In interpreting policy terms, this court is bound by the interpretive framework set forth by the Oregon Supreme Court in *Hoffman Constr. Co. of Alaska v. Fred S. James & Co. of Oregon,* 313 Or. 464, 836 P.2d 703 (1992), and its progeny." *Malbco Holdings, LLC v. AMCO Ins. Co.,* 629 F. Supp. 2d 1185, 1193 (D. Or. 2009). And "a proper assessment [under Oregon law] . . . does not begin . . . with case law. Rather, it begins with an examination of the words of the applicable provisions in the insurance policy[.]" *Interstate Fire & Cas. Co. v. Archdiocese of Portland in Or.,* 318 Or. 110, 117, 864 P.2d 346 (1993). Indeed, under Oregon law, "every contract of insurance

---

[5] "The best evidence of legislative intent is the words enacted into law by the legislature." *State v. Eggers*, 372 Or. 789, 798, 558 P.3d 830 (2024); *see also Adelsperger v. Elkside Dev. LLC*, 371 Or. 61, 70, 529 P.3d 230 (2023) ("[T]here is no more persuasive evidence of the intent of the legislature than the words by which the legislature undertook to give expression to its wishes." (citation omitted)).

Page 13 -     APPLICATION FOR APPOINTMENT OF ARBITRATOR UNDER 9 U.S.C. § 5

152515351.6 0028702-00030

shall be construed according to the terms and conditions of the policy." ORS 742.016(1). Oregon

courts interpret insurance policies as follows:

> The interpretation of an insurance policy is an issue of law. *Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or. 464, 469, 836 P.2d 703 (1992). The overriding goal in construing an insurance policy is to "ascertain the intention of the parties." *Dewsnup v. Farmers Ins. Co.*, 349 Or. 33, 39-40, 239 P.3d 493 (2010) (internal quotation marks omitted). We determine the intention of the parties by analyzing the policy's express terms and conditions. *Hoffman*, 313 Or. at 469, 836 P.2d 703; ORS 742.016(1) (providing that, with some exceptions, "every contract of insurance shall be construed according to the terms and conditions of the policy"); *see also Leach v. Scottsdale Indemnity Co.*, 261 Or.App. 234, 245, 323 P.3d 337, *rev. den.*, 356 Or. 400, 339 P.3d 440 (2014) ("[T]he interpretation of an insurance policy is a question of law that is confined to the four corners of the policy without regard to extrinsic evidence." (Internal quotation marks omitted.)). We "interpret the terms of an insurance policy according to what we perceive to be the understanding of the ordinary purchaser of insurance." *Congdon v. Berg*, 256 Or.App. 73, 87, 299 P.3d 588 (2013) (quoting *Totten v. New York Life Ins. Co.*, 298 Or. 765, 771, 696 P.2d 1082 (1985)); *see also* ORS 42.250 ("The terms of a writing are presumed to have been used in their primary and general acceptation[.]").
>
> If an insurance policy provides a definition for a term, we must apply that definition. *Holloway v. Republic Indemnity Co. of America*, 341 Or. 642, 650, 147 P.3d 329 (2006); *see also Andres v. American Standard Ins. Co.*, 205 Or.App. 419, 423, 134 P.3d 1061 (2006) ("The text of the policy includes any definitions of disputed terms included in the policy; we must, in fact, construe the policy in accordance with any such definitions."). When, on the other hand, a particular word or phrase is not defined in a policy, we first look to whether the word or phrase has a plain meaning—*i.e.*, the word or phrase "'is susceptible to only one plausible interpretation.'" *Holloway*, 341 Or. at 650, 147 P.3d 329 (quoting *Groshong v. Mutual of Enumclaw Ins. Co.*, 329 Or. 303, 308, 985 P.2d 1284 (1999)). If the word or phrase has more than one plausible interpretation, we then "examine the phrase in light of the particular context in which [it] is used in the policy and the broader context of the policy as a whole." *Holloway*, 341 Or. at 650, 147 P.3d 329 (internal quotation marks and brackets omitted). If, after examining the word or phrase in that context, the ambiguity persists—*i.e.*, two or more plausible interpretations remain—"any reasonable doubt as to the intended meaning of such a term will be resolved against the insurance company." *Id.* (internal quotation marks and brackets omitted).

*Hunters Ridge Condo. Ass'n v. Sherwood Crossing, LLC*, 285 Or. App. 416, 422–23, 395 P.3d

892 (2017) (brackets in original).

Page 14 -    APPLICATION FOR APPOINTMENT OF ARBITRATOR UNDER 9 U.S.C. § 5

152515351.6 0028702-00030

When an insurer fails to define a term in the policy, the insurer is bound by the term's plain meaning and context as understood by the ordinary purchaser of insurance. *See Chale v. Allstate Life Ins. Co.*, 353 F.3d 742, 746 (9th Cir. 2003); *Botts v. Hartford Accident & Indem. Co.*, 284 Or. 95, 101, 585 P.2d 657 (1978). Courts analyze dictionary definitions to ascertain plain meaning. *Hunters Ridge*, 285 Or. App. at 424; *see also Coelsch v. State Farm Fire & Cas. Co.*, 298 Or. App. 207, 212, 445 P.3d 899 (2019) ("[I]t is for the court to decide the definition which is properly applicable to the particular factual situation, taking into consideration what [the court believes] to be the popular non-technical understanding of the term." (brackets in original; citation omitted)).

Policy language is considered legally ambiguous when the language can "reasonably be given a broader or a narrower meaning, depending upon the intention of the parties in the context in which such words are used by them." *Shadbolt v. Farmers Ins. Exch.*, 275 Or. 407, 411, 551 P.2d 478 (1976). When courts have reached differing interpretations of the same terms, such judicial disagreement may be considered as evidence that the terms are ambiguous. *See St. Paul Fire & Marine Ins. Co. v. McCormick & Baxter Creosoting Co.*, 324 Or. 184, 215, 923 P.2d 1200 (1996). "[A] term is ambiguous * * * *only* if two or more plausible interpretations of that term withstand scrutiny, *i.e.,* continue[] to be reasonable," despite our resort to the interpretive aids outlined above." *Holloway*, 341 Or. at 650 (ellipsis and second brackets in original; citation omitted).

### 3.    The Plain Language of the Arbitration Clause Limits Defendants to a Single Party-Appointed Arbitrator

As noted above, the arbitration provisions at issue provide, in relevant part:

All differences arising out of this Policy may be referred to the decision of an arbitrator to be appointed by the parties in difference or, if they cannot agree upon a single arbitrator, to the decision of two arbitrators, one to be appointed in writing by each of the parties, or in case of disagreement between the arbitrators, to the

Page 15 -    APPLICATION FOR APPOINTMENT OF ARBITRATOR UNDER 9 U.S.C. § 5

decision of an umpire to be appointed in writing by the arbitrators before entering on the reference[.]

### a. The Arbitration Clause Broadly Encompasses All Differences Arising Out of the Policy, Including Multi-Insurer Disputes Involving Non-Signatories

Analysis of the appointment mechanism presupposes an antecedent determination of the scope of disputes subject to arbitration. To begin with, the arbitration provision applies to "[a]ll differences arising out of this Policy." That language is broad on its face and is not limited to disputes between the insured and the insurer, but instead extends to disputes that arise out of the policy and implicates other insurers that are also on the same risk—even non-signatories to the agreement.

The term "[a]ll" means "the whole number, quantity, or amount : TOTALITY." *Webster's Third New International Dictionary* 54 (unabridged ed. 2002). The term "differences" means "an instance of disagreement or a point upon which there is disagreement." *Id.* at 629. The ordinary meaning of the phrase "arising out of" is very broad. *Clinical Rsch. Inst. of S. Or., P.C. v. Kemper Ins. Cos.*, 191 Or. App. 595, 601, 84 P.3d 147 (2004). In the phrase "arising out of," "arise" can mean "to originate from a specified source," and "out of" is a "function word" to indicate either "origin or birth" or "cause or motive." *Id.* (citing *Webster's Third New International Dictionary* 117, 1603 (unabridged ed. 1993)). Accordingly, the phrase "arising out of" "connotes a causal connection with its subject and a concomitant broadening in the scope of the subject." *Id*. Finally, the term "this Policy" means the specific policy at issue. Grammatically, the subject of this noun phrase is the term "differences," which is modified by the determiner "all" and by the participial phrase "arising out of this Policy." Taken together, the phrase "arising out of" represents a causal connection to the term "differences" and operates to broaden that term, expanding its scope to

152515351.6 0028702-00030

encompass *all* disagreements that arise from the policy itself, without any textual limitation restricting those disagreements to a particular subset of parties.

In *Livingston v. Metropolitan Pediatrics, LLC*, 234 Or. App. 137, 139–43, 227 P.3d 796 (2010), a former employee asserted statutory and tort claims not only against his employer, the signatory to the employment agreement, but also against individual physicians and employees who were not signatories to the agreement. The arbitration provision provided that "[a]ny controversy, dispute or disagreement arising out of or relating to this Agreement, or the breach thereof, shall be resolved by arbitration." *Id*. at 146. Plaintiff contended that "because the clause applies to disputes *arising out of or relating to the agreement,* its application is necessarily limited to claims *under the agreement*—that is, between the parties to the agreement—and does not extend to claims arising generally out of plaintiff's employment." *Id*. at 150 (emphases in original).

The court rejected that argument. It explained that the clause's "arising out of or relating to" language is broad and, importantly, contains no express limitation restricting its scope to disputes between the parties to the agreement. *Id*. Because the agreement defined the relationship at issue, the court held that the clause was "reasonably susceptible" to a broader interpretation— one encompassing any claims arising out of or relating to that relationship. *Id*. at 150–51. The court further held that this broad language was sufficient to encompass claims against non-signatories where those claims arose from the same underlying conduct and depended on the same factual allegations as the claims against the signatory party. *Id*. In that circumstance, the absence of limiting language, combined with the shared factual predicate of the claims, supported application of the arbitration clause beyond the immediate parties to the agreement. *Id*.

So too here. The phrase "[a]ll differences arising out of this Policy" is at least as broad as the language in *Livingston* and likewise contains no textual limitation restricting arbitration to

Page 17 -    APPLICATION FOR APPOINTMENT OF ARBITRATOR UNDER 9 U.S.C. § 5

disputes between PacifiCorp and a single insurer. To the contrary, where—as here—multiple insurers are on the same risk and disputes arise from the same underlying loss and the same policy language, those "differences" share a common source in the policies themselves. Under *Livingston*, the absence of limiting language is dispositive: the clause is reasonably understood to encompass all disputes arising out of the policy, including those that necessarily implicate multiple insurers even if non-signatories to a particular policy. *See id.* at 151. That conclusion is reinforced by the nature of the claims at issue. As in *Livingston*, where the claims against non-signatories "depend[ed] on the same allegations" and arose from "identical circumstances," *id*. at 150, the disputes here arise from the same environmental claim (PHSS), involve overlapping questions of coverage, and turn on materially identical policy terms across the excess tower.

In sum, the plain meaning of the phrase "[a]ll differences arising out of this Policy" is broad enough to encompass "differences" between the insured and insurer, as well as "differences" between multiple insurers on the same risk (even if non-signatories to the policy) regarding the meaning of the particular policy at issue. If the drafters had intended to restrict arbitration solely to disputes between the insurer and the insured, it would have expressly limited the scope by stating, for example, "[a]ll differences between the Insurer and the Insured arising out of this Policy," or "[a]ll differences arising out of this Policy between the Company and the Policyholder." Such language would have confined arbitration to disputes between the contracting parties themselves, excluding disputes among multiple insurers on the same risk. The actual phrasing contains no such limiting terms and instead adopts an expansive formulation that encompasses any and all disagreements whose causal origin is the policy itself, not merely those between the insured and the particular insurer issuing it.

152515351.6 0028702-00030

**b.**    **The Appointment Provision Plainly Contemplates Only One Three-Member Panel When the Parties Do Not Agree on a Single Arbitrator**

The crux of the disagreement between PacifiCorp and Defendants—giving rise to the present impasse—is whether the arbitration clause requires the insurers to act collectively in appointing a single arbitrator or instead entitles each insurer to appoint its own arbitrator.

By its plain terms, the appointment clause does not grant each insurer an independent right to appoint its own arbitrator. The appointment clause provides for either a single arbitrator appointed by agreement of "the parties in difference," or—if no agreement is reached—"two arbitrators, one to be appointed in writing by each of the parties," followed by appointment of "an umpire" by the arbitrators in the event of disagreement between arbitrators. The provision thus describes a binary structure: either one arbitrator, or two party-appointed arbitrators and a single umpire appointed by those arbitrators. Because PacifiCorp did not agree to proceed before a single arbitrator, the appointment clause, by its terms, contemplates only one three-member panel.

The dispute turns on the plain meaning of the undefined term "parties," as used in the phrase "two arbitrators, one to be appointed in writing by each of the parties." The term "party" has multiple meanings.[6] But the only plausible definition here describes "parties" as "[t]hose persons who institute actions for the recovery of their rights, or the redress of their wrongs, and those against whom the actions are instituted." *Party*, *Black's Law Dictionary* (12th ed. 2024) (quoting Oliver L. Barbour, *A Summary of the Law of Parties to Actions at Law and Suits in Equity* 18 (1864)). From the perspective of the ordinary purchaser of insurance, "each of the parties"

---

[6] In *Twigg v. Admiral Insurance Co.*, 373 Or. 445, 458, 568 P.3d 156 (2025), the Oregon Supreme Court explained that "dictionary definitions can help inform whether a disputed term has multiple plausible interpretations and therefore lacks a 'plain' meaning," but a meaning is not plausible merely because it appears in a dictionary. Rather, courts must determine whether a proposed meaning aligns with what it "perceive[s] to be the understanding of the ordinary purchaser of insurance.'" *Id.* (quoting *Botts*, 284 Or. at 100).

Page 19 -    APPLICATION FOR APPOINTMENT OF ARBITRATOR UNDER 9 U.S.C. § 5

152515351.6 0028702-00030

refers to each side to the dispute (i.e., PacifiCorp v. Defendants), preserving harmony and giving effect to all elements of the arbitration provision.[7] *Hoffman*, 313 Or. at 472 (courts "assume that parties to an insurance contract do not create meaningless provisions").

Several insurers have asserted that the clause mandates separate, policy-specific arbitrations. They may argue that the provision governs only "differences" between the insured and the insurer issuing *that particular policy*, and therefore restricts arbitration to the two contracting parties. To support this reading, they may define a "party" as "[s]omeone who takes part in a transaction <a party to the contract>," *Party*, *Black's Law Dictionary*. But the Oregon Court of Appeals has already rejected that argument where the arbitration clause uses broad language. *See Livingston*, 234 Or. App. at 150–51.

In *Mecca v. Staten Island Radiological Associates P.C.*, 562 N.Y.S.2d 212, 213 (N.Y. App. Div. 1990), the court addressed whether an arbitration clause providing that "each such party shall appoint one * * * arbitrator" means each side of the dispute, or each party as a signatory to the agreement. (Ellipsis in original.) "Mecca and SIRA appointed one arbitrator each and the four remaining shareholders in SIRA also attempted to designate one arbitrator each. This construction of the arbitration clause would [have] permit[ted] SIRA and its shareholders to align a greater number of appointees against Mecca's single appointee." *Id*. The court held that the phrase "each party" means each side of the dispute—not each signatory—reasoning that an interpretation allowing multiple aligned parties to appoint separate arbitrators would create a structural

---

[7] Indeed, "[i]n bilateral arbitration, parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 348 (2011) (citation omitted). The insurers' interpretation—requiring separate arbitrators for each policy—would generate higher costs, greater inefficiency, and potentially inconsistent results, defeating the core benefits of bilateral arbitration.

Page 20 -    APPLICATION FOR APPOINTMENT OF ARBITRATOR UNDER 9 U.S.C. § 5

imbalance in the tribunal. *Id*. Applying that principle, the court rejected the attempt by the corporate respondent and its individual shareholders to designate multiple arbitrators on one side of the dispute, concluding that such a construction would render the arbitration a "sham" and its outcome a "foregone conclusion." *Id*. (citation omitted). Accordingly, the court limited the respondent side to a single party-appointed arbitrator and affirmed the trial court's authority to ensure the appointment of a neutral arbitrator if necessary to effectuate the agreement. *Id*. Therefore, the Court should appoint a single arbitrator for Defendants pursuant to the arbitration provision and FAA Section 5.

To be clear, PacifiCorp is not asking the Court to consolidate arbitration. Any procedural questions arising after the tribunal is constituted—including the applicable rules, administrative body, or whether consolidation is warranted—are for the arbitrators to decide. As the Ninth Circuit has explained, "[i]n the absence of an express agreement to the contrary, procedural questions are submitted to the arbitrator, either explicitly or implicitly, along with the merits of the dispute." *Lagstein v. Certain Underwriters at Lloyd's, London*, 607 F.3d 634, 643 (9th Cir. 2010) (citation omitted). "[N]o published decision in the Ninth Circuit has directly addressed whether consolidated arbitration is a[] [procedural] issue for the arbitrator[.]" *AmeriPride Servs., LLC v. Teamsters Loc. 87*, No. 1:21-CV-00969 JLT EPG, 2024 WL 4107280, at *18 (E.D. Cal. Sept. 6, 2024). Even so, several district courts have concluded that consolidation is such a procedural issue. *E.g.*, *id.*; *Meadows v. Dickey's Barbecue Rests. Inc.*, No. 15-CV-02139-JST, 2016 WL 7386138, at *2 (N.D. Cal. Dec. 21, 2016); *Cohen v. CBR Sys., Inc.*, No. 21-CV-06527-HSG, 2023 WL 8602288, at *2 (N.D. Cal. Dec. 12, 2023). The issue of consolidation is for the arbitrators to decide based on the common issues of law and fact present in this case.

Page 21 -    APPLICATION FOR APPOINTMENT OF ARBITRATOR UNDER 9 U.S.C. § 5

**4.     The Context of the Arbitration Clause Also Supports PacifiCorp's Interpretation**

If the Court cannot resolve this dispute based on the "plain meaning" of the appointment clause, the Court must "examine the phrase in light of the particular context in which [it] is used in the policy and the broader context of the policy as a whole." *Holloway*, 341 Or. at 650 (citation modified).

Each of the excess policies at issue conditions attachment[8] on the exhaustion[9] of specified underlying limits of liability. Determining whether these excess policies have attached necessarily requires reference to underlying policies, and allocation of underlying payments among the underlying policies. Resolution of this dispute will also require the arbitrators to make determinations about the number of "occurrences,"[10] amount of retentions,[11] the meaning of "ultimate net loss,"[12] and which payments erode underlying limits—issues that are defined by policy terms and operate across multiple layers of coverage. Many of the policies incorporate

---

[8] The attachment point is the point at which excess insurance limits apply.

[9] Vertical exhaustion is the legal theory that allows an insured with multiple primary and excess policies covering a common risk to seek coverage from an excess insurer as long as the insurance policies immediately beneath that policy have been exhausted, regardless of whether other primary insurance may apply. Horizontal exhaustion is a legal theory that requires an insured with multiple primary and excess policies covering a common risk to exhaust all underlying limits before invoking the next layer of excess coverage.

[10] The "number of occurrences" issue addresses whether multiple claims arise from a single occurrence or multiple occurrences under a liability policy—a determination that governs the application of limits, self-insured retention, and aggregates (if any), and often dictates the extent of coverage, with significant consequences for both insureds and insurers.

[11] Self-insured retention is the dollar amount specified in a liability-insurance policy to be paid by the insured before a particular insurer will respond to a loss.

[12] Ultimate net loss defines what damages are covered by an excess liability policy.

Page 22 -    APPLICATION FOR APPOINTMENT OF ARBITRATOR UNDER 9 U.S.C. § 5

"follow-form"[13] provisions, contain "other insurance"[14] or non-contribution[15] clauses governing how multiple policies respond to the same loss, or include settlement-of-claims and legal-expenses provisions requiring insurers to pay costs "in the ratio that their proportion of the liability for such claim or claims as finally adjusted bears to the whole amount of such claim or claims."

These provisions are designed to operate within a layered insurance program and, by their express terms, implicate multiple insurers on the same risk. Accordingly, the broader policy context confirms that the appointment clause contemplates multi-insurer disputes and that its reference to "two arbitrators" applies to both single-insurer and multi-insurer disputes.

5.      **At Most, the Arbitration Clause Is Ambiguous, and Must Be Interpreted in PacifiCorp's Favor**

If the Court cannot resolve the interpretative issues based on plain meaning and context—*i.e.*, two or more plausible interpretations of the appointment method remain—the provision may be deemed ambiguous, in which case "any reasonable doubt as to the intended meaning of such a term will be resolved against the insurance company." *Id.* (citation modified).

Defendants may argue that the doctrine of contra proferentem does not apply here because the policy is a manuscript policy. But any assertion that PacifiCorp co-drafted the operative language of the Arbitration Condition is both unsupported and factually disputed. No drafting history has been offered or is expected to be offered, nor could it be offered for any portion of the policies at issue in this litigation. *See, e.g.*, *Emps. Ins. of Wausau, A Mut. Co. v. Tektronix, Inc.*, 211 Or. App. 485, 505, 156 P.3d 105 (2007) ("[D]espite ordinary rules of contract interpretation,

---

[13] A follow-form provision provides an excess policy follows the underlying policy with respect to certain provisions.

[14] Other insurance clauses determine how loss is apportioned among insurers when multiple policies cover the same loss.

[15] "Non-contribution" provisions state that, even where multiple policies cover the same loss, this insurer will not participate in allocating or sharing that loss with other insurers.

Page 23 -    APPLICATION FOR APPOINTMENT OF ARBITRATOR UNDER 9 U.S.C. § 5

extrinsic evidence of the parties' intent is not part of the interpretation of an insurance policy under Oregon law."). Although PacifiCorp may have requested that arbitration occur in Portland, Oregon, that fact is not dispositive. Similar arbitration language appears in insurer-drafted policies, particularly historical Lloyd's forms. As a result, courts do not treat the insured as the drafter simply because such language appears in a manuscript policy. *See, e.g.*, *Yahoo Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 519 P.3d 992, 1000–01 (Cal. 2022). Accordingly, if the Court concludes that any portion of the arbitration provision is ambiguous, it must be construed in PacifiCorp's favor.

## VIII.  CONCLUSION

Congress enacted Section 5 precisely to prevent arbitration from "stagnat[ing]." *Pac. Reinsurance*, 814 F.2d at 1329. Allowing the present stalemate to continue would defeat the parties' expressed agreement to arbitrate "all differences arising out of" the policies and frustrate the FAA's core purpose of ensuring prompt and effective dispute resolution. As in *Pacific Reinsurance*, the appointment method here has proven impossible to implement, Defendants have failed to avail themselves of that method, and a substantial lapse has occurred. Under FAA Section 5, the Court therefore has both the authority and the responsibility to appoint an arbitrator so that arbitration may proceed with the force and effect the parties agreed to.

PacifiCorp's request under FAA Section 5 is narrowly circumscribed. PacifiCorp seeks a finding (1) that Defendants have "fail[ed] to avail" themselves of the appointment method prescribed in the policies, or (2) that there has been "a lapse in the naming of an arbitrator" by Defendants under the prescribed method. Based on the foregoing, PacifiCorp respectfully requests that the Court "designate and appoint an arbitrator [for Defendants] . . . who shall act under the said agreement[s] with the same force and effect as if he or they had been specifically named

Page 24 -    APPLICATION FOR APPOINTMENT OF ARBITRATOR UNDER 9 U.S.C. § 5

therein." 9 U.S.C. § 5. In the alternative, PacifiCorp asks the Court to impose a short deadline by which Defendants must agree on a mutually acceptable arbitrator for the insurer group and, if they fail to do so, to designate and appoint an arbitrator so that arbitration may proceed thereafter.

DATED: April 16, 2026                    STOEL RIVES LLP


                                         s/ Cameron Zangenehzadeh
                                         SETH H. ROW, OSB No. 021845
                                         seth.row@stoel.com
                                         CAMERON ZANGENEHZADEH, OSB No. 212756
                                         cameron.zangenehzadeh@stoel.com
                                         Telephone: (503) 224-3380

                                         *Attorneys for Plaintiff PacifiCorp*

152515351.6 0028702-00030